20

Lamina Cory, Appellee, v. Woodmen Accident Company, Appellant.

Gen. No. 8,135.

Opinion filed January 25, 1928. Re-hearing denied April 12, 1928.

WILLIAM and BARRY MUMFORD, for appellant.

CAPPS & WEAVER, for appellee.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

This suit was instituted in the circuit court of Pike county against the appellant, Woodmen Accident Company, by the appellee, Lamina Cory, who is the beneficiary named in an accident indemnity policy issued by the appellant company to Martin C. Cory, the appellee's husband. The appellee claims the right to recover an indemnity of $1,000, under the terms of the policy. The declaration alleges that Martin C. Cory died by external violent and accidental means; and that his death resulted directly and exclusively from a bodily injury, namely, a gunshot wound which was affected by accidental means—the discharge of a certain firearm held by one Victor Seybold on the 15th

day of June, 1924. There was a jury trial and a verdict finding the issues in favor of the appellee, and fixing the amount of her damages at $1,000. At the instance of the appellant, the jury made a special finding that the injury to the insured, Martin C. Cory, was not sustained while he was in the act of fighting. The appellant made a motion to set aside the verdict and the special finding; and for a new trial, which was denied by the court. Judgment was thereupon rendered against the appellant for the amount of the verdict, and this appeal is prosecuted from the judgment.

A number of grounds are urged on appeal for reversal of the judgment. It is insisted that Cory's death did not result from accidental means; that the deceased was engaged in fighting at the time he was shot, which resulted in his death; also, that the act of shooting, which inflicted a mortal wound on Cory, was the intentional act of Victor Seybold, the person who did the shooting; and that under section 30 of appellant's by-laws no indemnity can therefore be recovered under the policy.

There is very little controversy about the facts: The insured Martin C. Cory procured the indemnity policy in question for the benefit of his wife on June 3, 1912. At the time the policy was issued and at the time of his injury and death, he resided with his family on a farm in Pike county, near Tempest. Mina Huston, a niece, resided with the Cory family; she had been keeping company with a young man by the name of Victor Seybold, who was about 19 years of age at the time of the occurrence on June 15, 1924, in which Cory was injured, which injury finally resulted in his death. Late in the evening of the day mentioned, Seybold had an altercation with Cory, in which he shot Cory and thereby caused the mortal wound, from which Cory died on July 23 following. Concerning the incidents connected with the shooting of Cory, the appellee,

Lamina Cory, testified as follows: "On the evening of June 15, 1924, we went to a children's day exercise at Morrellville, Illinois, which I judge is about three miles from our home and we returned home I judge between ten and eleven o'clock at night. In our party so returning home, my husband and my three children were with me. The name of the oldest child is Edwin. He was then 11 years old. . . . When we got home we drove our car into the car shed, and I got out and went to the house. My husband came to the house a few minutes afterwards. Mina Huston and a fellow by the name of Johnson had come to our home before we got there, and were sitting in a car in front of the gate. Mina Huston was my niece and she made her home with me. They were sitting in a car in front of the gate when we got home; Mina Huston and the Johnson boy. As we went in at our home we drove in front of their car. We stopped just long enough for me to say to my niece, you had better come into the house. No other persons were there except Miss Huston and Mr. Johnson. My children went into the house with me. Later my husband came in, perhaps two or three minutes later. This house is on a farm and is situated south of and facing an east and west road. When my husband came in he went into the northeast bedroom. I was in the room used by us as a living room and was lying on a couch. This room I was in is south of the room into which my husband went. He came through the room where I was. The house has a north door and two east doors. A walk leads from the gate south to the house. It comes to the front door and goes around to the east door. The front gate is a little bit east of north from the north door. . . . I saw my husband after he went into the living room. It was just a short while after; a few minutes before I saw my husband again, I heard Mina Huston come to the north front door and heard her say, Uncle Mart, some

one out here wants to speak to you. I knew the voice as that of Mina Huston. I was sitting on the couch in the living room. Before that I had heard a car drive up in front; did not notice whether it stopped. My husband replied to Miss Huston, all right, I'll be there. He then came back through the room I was in and went out through the east door. The next thing I heard was a gun shot. I jumped up and started out to where it was. I went out the east door and went north. The next thing I heard was another gun shot. The next thing I heard was from my husband who hollered to me, 'The G—— d —— little s—— b—— has got me; go call the sheriff.' Vic (Seybold) said 'Don't call the sheriff; if you do, I'll shoot the whole G—— d—,—— family.' Seybold lived about a mile west of the house. I was well acquainted with him. I know his voice. I turned and ran into the house and called the sheriff. My husband came in later; I judge in about two or three minutes. When he came in he was holding his hand to his side like this (indicating). I was at the telephone. He walked in at the east door and on to the couch and lay down. I went to him after I called the sheriff. I found that he had been shot in the side (indicating). I removed his clothing so I could see the wound. I did see the wound there. When my husband went out to the road he was in his shirt sleeves. He had changed to a blue shirt after he came back from the children's exercises. I called Dr. Andrew and Dr. Chaisson. My husband lived for five weeks and three days after he was shot."

The appellant, in denial of appellee's right to recover under the policy, and as a matter of defense, put in evidence section 30 of the by-laws of the appellant company bearing upon the questions referred to. Section 30 of the by-laws provides: ". . . No indemnity shall be provided for either disappearance, or injuries, disability or death sustained under any of the follow-

ing conditions: . . .; while the insured is engaged in any of the following risks or acts: dueling or° fighting; . . . violating the law of any State or Nation; . . . No indemnity shall be provided to cover injuries, disability or death, due wholly or in part, directly or indirectly, to any of the following causes: . . .; intentional acts of the insured or any other person.

In considering the merits of appellant's defense under the by-laws which limit liability under the policy sued on, consideration should be given to the fact that these are laws prepared by the appellant, and the language employed for the purpose of limiting liability was prepared by the appellant; and therefore in construing the by-laws a construction thereof should be given which is most favorable to the insured; that is to say, they should be construed so as to enable the beneficiary to get the benefit of the indemnity provided for her in the policy, if such construction is reasonable and just; *Niagara Fire Ins. Co. v. D. Heenan & Co.*, 181 Ill. 575, affirming 81 Ill. App. 678; *National Masonic Acc. Ass'n v. Seed*, 95 Ill. App. 43.

Concerning appellant's contention that Martin C. Cory was shot during his altercation with Victor Seybold, when he was in the act of fighting, the testimony of Seybold given at the trial must be considered. Mina Huston, on the evening that the shooting took place, had attended the children's day exercises at Morrellville, with the Cory family, and had returned from the entertainment mentioned to the Cory home, about eleven o'clock p. m., with a young man by the name of Johnson, who had taken her there in his car. Mina Huston and Johnson were sitting in the Johnson car which was standing in front of the Cory home when the Cory family returned from the entertainment. Afterwards, Seybold drove up in his car in company with another young man by the name of Leslie Potter. He testified that he got there between ten and eleven

o'clock that evening; that he found another car in front of the Cory home and that Herbert Johnson and Mina Huston were in the car; and that he stopped; that he saw Martin Cory that night; that he saw him first at the children's exercises; that he had known Martin Cory before that; that he had never had a controversy with him before; that when he first saw Martin Cory that night at his home he was coming down the walk to the road where he was standing behind his car; that he came out to the gate and stepped over a few feet west behind the Johnson car; when he stopped, that he and Cory were about six or eight feet apart; that Cory spoke first saying, "here we are, what will you have?" Concerning what occurred after that, Seybold's testimony is as follows: "His tone attracted my particular attention. I never before had a controversy with him. I had been calling there upon the young lady who afterwards became my wife. She was working there. Next after he spoke I asked him what he told Mina I had said about her. He said, you have said a h—— of a lot. Next, I said, I hadn't. I denied making any statement. He then called me a d—— liar. During this altercation we remained in the same positions we were in when he stopped, neither of us advanced towards the other at any time. When he called me a liar I guess I called him another one. He then started to come towards me. I did not start towards him but he started towards me. I told him to stand back or I would shoot him, and he said, no you won't, and came on and grabbed me around the neck, and I pulled back about eight or ten feet, and I shot at the side of him; he doubled up with his right arm around my neck and began to reach for his hip pocket and I shot him. We were on the south side of the road and he got his right arm around my neck. He did nothing with his right hand till I fired the first shot. I backed off six or eight feet from where I was standing. His arm was around

my neck. After I fired the first shot he tightened up on my neck and grabbed for his hip pocket with his left hand. I kept backing across the road. When I finally shot him we were pretty well to the north side of the road, and I fired the second shot." Seybold was thereupon interrogated as follows:

"Q. Did you intend to hit him with that revolver? A. I did.

"Q. Did you intend to kill him? A. I did not.

"Q. What did you intend to do? A. To make him let loose. ∘

"Q. Did it have that effect? A. It did."

Seybold also testified on cross-examination as follows: "He grabbed me as I pulled the gun out of my pocket. He pulled me up to him. I pulled my head down to keep him from getting too close. Then he was putting his left hand to his left pocket. He was not trying to get my throat with his left hand. . . . I shot by the side of him the first time. I didn't intend even to hit him. The next time I did intend to hit him, but did not intend to kill him. I shot to make him let loose and he did let loose." The wound inflicted by Seybold was a mortal wound which caused an abscess to form on the liver from which he died.

It will be noted, from the testimony of Seybold, that there was no attempt on the part of Cory, at any time during the altercation, to strike Seybold or injure him in anyway; and it is but a fair inference, from the testimony of Seybold himself, that Cory's actions and movements apparently had in view either to disarm Seybold or get him in a position where he could not use his gun. We conclude, therefore, that the jury were warranted in drawing the inference embodied in the special finding, that Cory was not "fighting" Seybold at the time he was shot. It is also proper and reasonable inference to be drawn from the evidence, and directly from the testimony of Seybold himself,

that Seybold had no intention of inflicting a mortal wound on Cory, and that Cory did not have any idea that he would do so; and that the death of Cory was therefore a matter which was unforeseen and unexpected by both Seybold and Cory, and not intended by Seybold. Cory's death being unforeseen and unexpected from the act of Seybold and not intended and not the necessary result of the shooting, can therefore reasonably be regarded as accidental, and should be so regarded as a matter of law. Cooley in his Briefs on Insurance gives a very clear definition of what should be considered accidental means: An effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of such means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, is produced by "accidental means." 4 Cooley's Briefs on Insurance 3156. In *Higgins v. Midland Casualty Co.*, 281 Ill. 431, in considering the question here involved, the Supreme Court said: "If, in the act which precedes the injury, though an intentional one, something unforeseen, unexpected and unusual occurs which produces the injury, it is accidentally caused." And in *Nalty v. Federal Casualty Co.*, 245 Ill. App. 180, the Appellate Court gives the following definition of an accidental injury: "One which could not have been reasonably anticipated and which he did not intend to produce; that is, it was not the natural or probable consequent of his act; and was not the result of design but was produced unexpectedly and by chance." There are a number of authorities to the same effect: *Robison v. United States Health & Accident Ins. Co.*, 192 Ill. App. 475; *Hutton v. States Accident Ins. Co.*, 267 Ill. 267; *United States Mut. Accident Ass'n v. Barry*, 131 U. S. 100. Another definition is, an effect which does not ordinarily follow and can-

not be reasonably anticipated from the use of those means; an effect which the actor did not intend to produce; and cannot be charged with the design of producing, is produced by accidental means. *Western Commercial Travelers' Ass'n v. Smith,* 85 Fed. 401, 40 L. R. A. 653; *Lickleider v. Iowa State Traveling Men's Ass'n,* 184 Iowa 423, 3 A. L. R. 1295. We therefore conclude that the inference may be justly and properly drawn from the facts proven, that the death of Martin C. Cory resulted directly and exclusively from external violent and accidental means, and that the jury were warranted in so finding by the verdict.

It is also contended by the appellant, that under the by-laws of the company, in order to entitle the appellee to recover the indemnity claim, that it was necessary that written notice of the injury which Cory suffered should have been given by Cory and received by the appellant at its home office at Lincoln, Nebraska, within 20 days after such injury; and that the proof does not show that such notice was given and received. It may be said, with reference to this contention, that the proof shows that W. W. Hooper, who was the agent of the appellant at that time, to collect premiums on its policies, at the instance and request of E. E. Cory, the uncle of the insured, and acting in his behalf, sent a notice to the appellant, through the mails by letter, informing appellant company of the injury which Cory had suffered, and calling the company's attention to the policy which he held by number; and that this notice was sent within 14 days after the injury. Hooper testified that he wrote the letter on the typewriter and mailed it, addressed to the Woodmen Accident Company, Lincoln, Nebraska, its home office; that he mailed it the evening of the day that he wrote it. Appellant insists that this proof is insufficient; and that it does not show that the appellant company received the letter at its home office at Lincoln, Nebraska, within 20

days as required by the by-laws. It was not incumbent upon the appellee to show by direct evidence that the appellant received the letter containing the notice at its home office at Lincoln, Nebraska, and the court will take judicial notice of the fact that by the ordinary course of the post, a letter mailed at Baylis, Illinois, 14 days after the injury, would reach Lincoln, Nebraska, within 20 days of the day of the injury. *National Masonic Accident Ass'n v. Seed,* 95 Ill. App. 43. And appellant did not offer any evidence to rebut this presumption of law. But it should also be pointed out in reference to this contention, that the by-law referred to, which requires notice for accidental injuries to the insured, clearly has reference to such injuries which are the basis of a claim for indemnity by the insured, and does not apply to claims by a beneficiary in the policy for indemnity on account of the accidental death of the insured, and therefore the notice referred to was not necessary as a condition precedent to a right to recover an indemnity claim such as the one involved in this controversy. It is further contended by the appellant company that there were no proofs of death forwarded to the company within 90 days as required by the by-laws, and that therefore the appellee has no right to recover the indemnity. The by-law referred to provides that: "No payment shall be made on any claim until complete proof has been furnished the company at its home office, Lincoln, Nebraska, to enable it to know and determine the character and extent of any injury for which claim is made, nor unless such proof is filed with the secretary within ninety (90) days of the death. . . . Claims shall be due and payable within 60 days from the date on which satisfactory proof is filed in the home office, Lincoln, Nebraska." It is evident from the tenor of the by-law just referred to, that its purpose is to procure for the company complete and satisfactory proof of death, so as "to

enable the company to know and determine the character and extent of any injury for which claim is made." The by-law does not specify in what form or character the proof of death shall be made, which shall be considered complete or satisfactory to the company; nor does it specify how. the proof shall be made, nor that the same shall be verified. There was evidence introduced at the trial, without objection, which tended to show a substantial compliance by the appellee with the requirements of the by-laws concerning proof of death, which was satisfactory to the appellant as to completeness. J. L. Stauffer testified that after Cory's death, at the request of the appellee, he wrote and mailed a letter to appellant of the following import: "On June 1st, 1912, you issued an accident policy number 231588 to Martin C. Cory, Baylis, Ill. Mr. Cory was killed recently and we would like to know, at the request of his wife if this policy is still in force, and if Mr. Cory has kept his assessments paid." And on August 18 following sent another communication by mail to the appellant company at its home office in Lincoln, Nebraska, which is as follows:

"Farmers Bank of Baylis                     Baylis, Ill.,
                                                    August 18, 1924.

Woodmen Accident Association,
Lincoln, Neb.
"Gentlemen:
"In reply to your late letter asking particulars about the death of Martin C. Cory who held a policy with you. Mr. Cory was called out of his home on the evening of June 15, 1924, and shot. He died on July 26, 1924, being in a serious condition from time of being wounded until his death.
"Will you kindly send necessary blanks to file claim.
                                    Yours respt.,
                                        J. L. Stauffer."

To the last letter, the appellant company made the following reply:

"Woodmen Accident Company
Lincoln, Nebraska.
Mr. J. L. Stauffer,                                    August 20, 1924.
Baylis, Ill.                    Re: Martin Cory, Baylis, Ill.
"Dear Sir:

"While your letter of August 18, does not give very complete particulars we have since the receipt of your previous letter made some investigation of the case. From the information at hand it appears that Mr. Cory was purposely shot by one Victor Seybold and the circumstances seem to be such that claim for the principal sum of his accident insurance policy cannot properly be filed.

"The by-laws of the company which are made a part of the insurance contract provide that no indemnity shall be paid for disability or death due to intentional acts of the insured or any other person. We enclose a copy of the by-laws and refer you particularly to section 30.

Yours truly,
Woodmen Accident Company,
M. E. Lindberg,
MEL:E                    Auditor of Claims."

Thereafter on Oct. 8, before the expiration of the 90-day limit for filing proofs of death, Capps & Weaver, as attorneys for the appellee, sent the following communication to the appellant company at its home office in Lincoln, Nebraska:

"October 8, 1924.
Woodmen Accident Company,
Lincoln, Nebraska.
"Dears Sirs:          Re: Martin Cory, Baylis, Ill.

"We are in receipt of your letter of the 8th inst., denying liability on your policy issued to the above named. We note you request we furnish you the spe-

cific cases to which our former letter seems to have reference. The last word of the Courts of this State in cases similar to this, we believe to be the decision of the Appellate Court of the 4th District, handed down at the October Term, 1923, in the case of Jennie Nalty, Appellee, vs. Federal Casualty Company, Appellant. This decision has not yet been published in our bound volumes. For a small fee a copy of this opinion can be obtained from Robt. B. Roe, Clerk of Appellate Court, Mt. Vernon, Illinois.

"We do not know whether Mrs. Cory has made formal proof of death in this case or not, and in view of your denial of liability we do not believe that such proof is necessary. However, to avoid any question upon that point, if she has not made such proof, will you kindly forward us at once the necessary blanks for making the same, so that we may get them in within the time required.

Yours very truly,

Capps & Weaver."

The appellant company made no reply for nearly a month to the letter of appellee's attorneys, requesting blanks of the company to make complete proof of death, not until November 5, after the 90-days' limit had expired, but no blanks were sent. In this letter, apparently in explanation of the company's failure to forward blanks, the appellant says: "In the last part of your last letter you referred to the matter of final proofs and we will advise that none have been submitted. We really cannot see that there is anything to be gained by going to the trouble and expense of completing proof for the facts in the case seem to be clear as to the circumstances and manner in which death occurred." It will be noted that the position taken by the company in the letter last referred to is in accord with the position assumed in its letters of reply to Stauffer's letter of August 18, in which Stauffer had also requested the company to send the necessary

blanks for filing appellee's claim; and the request was not complied with presumably for the same reasons given in the company's letter of November 5. And it is apparent, from the correspondence referred to, that the appellant company did not at any time deem it necessary to have any further or more complete proof of death than those which it had had on hand; and that it considered the facts concerning the death of Cory contained in the communications sent in at the instance of the appellee sufficiently complete and satisfactory "to enable the company to know and determine the character and extent of any injury for which claim is made," and therefore did not send any blanks to the appellee for more complete proofs of Cory's death within the 90-days' limit. Having assumed that position, the appellant could not, after the expiration of the time limit, change its position to the detriment of appellee's right of recovery, but it is legally estopped to deny that complete or satisfactory proofs of death to comply with the by-laws were not furnished by the appellee. It is pointed out in 1 Herman on the Law of Estoppel, sec. 736: "The unsolemn admissions extra judicium, which have been acted upon or were to influence the conduct of others, or to derive some advantage to the party which cannot be afterwards claimed without breach of good faith are known as estoppels in pais:" Also that: "The rule of law is clear, that where one by his words or conduct wilfully causes another to believe the existence of a certain state of things and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the time." 1 Herman on the Law of Estoppel, sec. 750. *Pickard v. Sears,* 6 Ad. & El. 469; *Niantic Bank v. Dennis,* 37 Ill. 381, cited in 132 Ill. 645. "Representations are to be regarded as wilful when the person making them means them to be acted on, or if without regard to the inten-

tion, he so conducted himself that a reasonable man would take the representation to be true, and believe it was meant he should act on it." 1 Herman on the Law of Estoppel, sec. 754. "A fraudulent intention is not essential to the doctrine of estoppel. It is enough if a fraudulent effect would follow allowing a party to set up a claim inconsistent with his former declarations or conduct." *Milligan v. Miller*, 253 Ill. 511. The proof made of what was done by the parties concerning proofs of death was competent under the averments of the declaration, and as tending to show performance of the conditions of the policy. It is not necessary however to specially plead a matter which constitutes an estoppel *in pais*, but such estoppel may arise from the evidence and can be relied on as conclusive without being specially pleaded. 2 Herman on Law of Estoppel, p. 1441, sec. 1296; Bigelow on Estoppel (1st Ed.) 590; 2 Smith's Leading Cases 794, 954; 8 Ency. of Pl. & Pr. 6; *Welland Canal Co. v. Hathaway*, 8 Wend. (N. Y.) 483; Oliver, Duchess of Kingston Case, (7th Am. Ed.) 658; May on Insurance, sec. 505. Moreover, the appellant in its letter of August 20, 1924, hereinbefore set forth, denied the legal right of appellee to file a claim for the indemnity in question, and denied its liability under the policy. It is well settled that a denial of liability dispenses with the necessity of filings proofs of death. *Metropolitan Accident Ass'n v. Froiland*, 161 Ill. 30; *Covenant Mut. Benefit Ass'n v. Spies*, 114 Ill. 463, affirming 59 Ill. App. 522; *Metropolitan Life Ins. Co. v. Zeigler*, 59 Ill. App. 447.

Complaint is also made that there was error in the giving of some of the instructions for the appellee, and in modifying some of the instructions given for the appellant, but the instructions are not set out in the brief and argument, but merely referred to by designated numbers. The questions involved are therefore not properly before us for consideration. In *General Platers Supply Co. v. L'Hommedieu & Sons Co.*, 228

Ill. App. 201, the court referring to this matter pointed out: "Counsel for defendant has questioned some of the instructions given and refused, but in argument presents them only by number. This is not the proper way to present instructions for consideration by this court. Instructions of which complaint is made should be set out in full, followed by definite and clear reasons supporting the alleged errors incident thereto." And in *Sterling Midland Coal Co. v. Ready & Callaghan Coal Co.,* 236 Ill. App. 403, the court said: "Counsel for the defendant further contend certain instructions given on behalf of the plaintiff are erroneous. These instructions are not set out in the brief of counsel for the defendant, but are merely designated as instructions Nos. 2, 3 and 5. It has been held that this is not the proper way to present instructions for consideration by the court." These matters of complaint are therefore not before us for review.

For the reasons stated, the judgment is affirmed.

*Judgment affirmed.*